UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF MISSISSIPPI

IN RE: OXFORD EXPOSITIONS, LLC                    CASE NO. 10-16218-DWH

OXFORD EXPOSITIONS, LLC                                          PLAINTIFF

VERSUS                                          ADV. PROC. NO. 11-01009-DWH

JASON HYLAND, et al.                                            DEFENDANTS

OPINION

On consideration before the court is a motion for partial summary judgment filed by the

debtor/plaintiff, Oxford Expositions, LLC, (hereinafter "Oxford Expo"), as well as, a cross-

motion for summary judgment filed by the defendant, Jason Hyland, (hereinafter "Hyland");

responsive pleadings and memoranda of law having been filed by the respective parties; and the

court, having considered same, following oral argument, hereby finds as follows, to-wit:

I.

JURISDICTION

The court has jurisdiction of the parties to and the subject matter of this adversary

proceeding pursuant to 28 U.S.C. § 1334 and 28 U.S.C. § 157.

This adversary proceeding was initially commenced when Oxford Expo filed a complaint

against Hyland on September 3, 2010, in the Chancery Court of Lafayette County, Mississippi.

This proceeding, as well as, a companion proceeding, which was initiated by Hyland in the

Circuit Court of Lafayette County, Mississippi, were removed and referred to this court for

disposition. The court is of the opinion that the above captioned adversary proceeding is a core proceeding as defined in 28 U.S.C. § 157(b)(2)(A), (B), and (O). It is, in essence, a declaratory judgment cause of action seeking a determination as to whether a contract was formed between the debtor, Oxford Expo, and Hyland. It likewise will be dispositive as to whether Hyland has claims against the Oxford Expo bankruptcy estate.

Through their respective filings, the attorneys representing the parties represented to the court that significant parts of this proceeding could be determined on the basis of the competing motions for summary judgment. As support for their positions, they provided the court with numerous evidentiary materials which include depositions, affidavits, and documentary exhibits, many of which will be discussed hereinbelow. While the parties strenuously disagree as to the relevance and significance of many of the factual events that underpin this proceeding, they do agree that these factual events actually occurred. The court, therefore, concurs that significant parts of this proceeding can be decided on the basis of the motions for summary judgment which incorporate the aforementioned evidentiary materials.

II.

## FACTUAL EVENTS

### A. Introductory Events

Oxford Expo is a limited liability corporation that was formed on February 16, 2010, at the request of Dr. Edwin E. Meek, ("Meek"). The legal work to form the corporation was performed by Attorney Selby A. "Sai" Ireland with the Butler Snow law firm in Jackson, Mississippi.

Meek and Hyland, both of whom are from the Oxford, Mississippi, area, met in late 2009. Hyland had produced a trade show in November, 2009, which he called the AgriSouth Horticulture Expo, which was held in Memphis, Tennessee. Meek, who had been successfully involved in the trade show business for many years, attended the AgriSouth show. Shortly after the show's conclusion, Hyland advised Meek that the AgriSouth show was his first production, and that he had earned net profits approximating $39,147.31. (See, Hyland's affidavit.)

In December, 2009, Meek and Hyland had discussions about the possibility of producing a trade show together related to the broadband industry. In connection with this potential venture, they traveled to Las Vegas in January, 2010, to meet with members of the Wireless Internet Service Providers Association. On January 25, 2010, Meek sent an e-mail to Attorney Hale Freeland and requested that he "draw up" a limited liability corporation named Hyland Expositions to be used in the trade show industry. The e-mail indicated that Hyland would be the owner of 60% of the corporation. A return e-mail from Hyland to Meek and Freeland reflected that Hyland was the President of Hyland Media Company, LLC. As will be seen hereinbelow, this was not an accurate representation. Regardless, the formation of Hyland Expositions went no further.

A short time later, Meek indicated that he wanted to form a corporation which would include Hyland as a salaried employee, as well as, a potential 10% owner. As evidenced by an e-mail prepared by Meek on February 8, 2010, Meek relied upon his attorneys to appropriately structure all of his business ventures. Meek stated, "I do not understand all of the ins and outs but Butler-Snow has set up deals like this many times. Provisions are provided for buyouts, etc. We will all look at that when they provide us something. All I can say to you and to Jen, this has

3

to work and be fair to all of us, and that is what will be done or we will not go forward."

(emphasis supplied). This e-mail is significant because it demonstrates that Meek provided clear

and unambiguous notice to Hyland that the terms and intricate details of the transaction would be

orchestrated by the Butler Snow attorneys.

After several "back and forth" e-mails, Meek sent an e-mail to Hyland on February 11,

2010, at 4:36 p.m., which is set forth fully hereinbelow:

| | |
|---|---|
| From: | Ed Meek [edmeck1@gmail.com] |
| Sent: | Thursday, February 11, 2010 4:36 PM |
| To: | jason@hylandmedia.com |
| Cc: | Jennifer Robinson |
| Subject: | Proposal (revised final) |

Jason,

Below is a summary of our discussion and some additional detail on how all this will work. There is one change which I think is appropriate. We want to cap the profits at $100,000, which is $10,000 above your estimate.

Making it as simple as possible, I proposed to buy your show by paying you $40,000 against the expected profits of up to $100,000 that you anticipate to make in 2010 show. Any profits above $100,000 would go into the newly formed company, Oxford Expositions, which you will be given 10 percent interest/ownership in as well. At the conclusion of the show, we will deduct the $20,000 owed plus interest as agreed, and give you the balance of profits up to $100,000. If in the unlikely case that the show fails, Oxford absorbs the loss. The only expenses that will be added to the AgriSouth budget for the 2010 year will be half of your salary and some rent.

All accounts payable and receivables and budget will be a part of Oxford Expositions accounting systems. Each show in the Oxford Expositions portfolio will have its own budget and reporting system. You will need to provide the budget that you have created. In terms of the public view, the show remains the same with you running it and driving sales, but Jen and I will have a presence as

owners with you in Oxford Expositions. Together, we will all work on The Broadband Expo, AgriSouth, and any other ventures we may be able to launch.

Should Oxford Expositions fail, you will be provided the option to buy back Agri-South at the same price paid to you.

For the new company, Oxford Expositions, Jen will be CEO and you will assume the title Executive Vice President. All of us as owners will have input into all aspects of operation of the company and together develop strategies for growth and expansion. My role will be to advise, assist and oversee the budget. Jen's role will be to run the company on a day-to day basis and your role as number two will be to aggressively promote and support programs of the company, provide leadership to the team and together we can all create a company that can thrive and provide long-term financial gain. Incentives, based on performance and profitability, will be included for you and Jen. I know Jen well enough that she, like you, wants incentives and to be rewarded based on performance, and both of us know that incentives are critical to development of a highly motivated team. You asked if the $100,000 top is in addition to your salary, and it is less the $20,000 loan and the inclusion in the P & L of half your salary and some rent allocation.

I hope this clarifies how this would work. If you have other concerns that I may have forgotten from our discussion yesterday, please let me know.

Please confirm your acceptance and I will have Butler-Snow draw up an agreement.

Ed

Having reviewed this document numerous times, the court would offer the following

comments:

1.    Initially, this proposal offers to purchase Hyland's AgriSouth trade

show by the payment of a $40,000 advance against the anticipated

profits of $100,000, which would be earned when the show was

produced sometime later in calendar year 2010. After the

deduction of certain expenses, including the repayment of a

5

$20,000 loan plus interest that Hyland had obtained from Meek's wife, Becky, as well as, one half of Hyland's unspecified salary and certain rents, Hyland would be entitled to the balance of the profits up to $100,000. If the profits exceeded $100,000, they would be paid into the newly formed Oxford Expo.

2.  Hyland was to be given a 10% ownership interest in Oxford Expo, and he would be given the title Executive Vice President.

3.  In the event that Oxford Expo failed, Hyland would be provided an option to buy back AgriSouth at the same price that was paid to him.

4.  Incentives, based on performance and profitability, would be included for Hyland and for Jennifer Robinson, who would be serving as the Chief Executive Officer. All of the officers would work on the Broadband Expo, AgriSouth, as well as, any other ventures that could be launched.

5.  The agreement(s) would be prepared by the Butler Snow law firm.

Hyland contends that once he accepted the provisions as outlined in the aforementioned e-mail that a binding contract was formed. To the contrary, Oxford Expo asserts that the e-mail was at best only the outline of a proposal to be structured by the Butler Snow attorneys.

### B. Due Diligence Investigation

On February 13, 2010, two days after the e-mail set forth hereinabove was disseminated, Meek requested that Hyland furnish his tax return for the previous year and inquired about the status of Hyland Media as a registered company. Not only did Meek learn that the registration

6

for Hyland Media had not been completed, but he found out that AgriSouth Horticulture Expo

was also not an incorporated entity. AgriSouth was simply a sole proprietorship operated by

Hyland. The following information appears in e-mails sent by Hyland to Meek on February 13,

2010:

> I just registered it [Hyland Media] a few weeks ago, to proceed with this year. I will cancel that registration as it has not been complete. The way I see this is that we are merging my sole operating show with payables and receivables into your company. I am not being "bought" as a typical company would sell. You are simply giving me 10 percent ownership in the new company for my show. Paying me a salary, fronting me a draw of $40k and then paying a profit share up to 100k to me. Believe me when I say financials have been loose the last year and your [sic] not buying property or such. Should be very simple. I have done the full sale of a company before and this is not what this is.
>
> . . . .
>
> All of this is fine and well, but last year agrisouth was a sole proprietorship and it "the show" will not have a tax return done for itself. It is being included in my tax papers which include my other duties last year as well. I will provide what I can but I will not provide the unnecessary personal tax stuff, etc.

In effect, both Hyland Media Company, LLC, and AgriSouth Horticulture Expo, as

explained by Hyland's e-mails, were just Jason Hyland, individually. As such, AgriSouth was

only a concept that anyone could utilize without fear of reprisals for infringement. Prior to these

revelations by Hyland, Meek and the Butler Snow attorneys were contemplating the structuring

of an asset purchase contract with the attendant ancillary agreements. Since there was no

AgriSouth entity, what Hyland had to sell was himself, plus the existing AgriSouth accounts

receivable and accounts payable which were in an almost indecipherable condition as noted in

the discussion which follows.

7

According to Cindy Sinervo, Meek's daughter, who was to perform the accounting services for Oxford Expo, the economic condition of AgriSouth had been significantly inflated as best she could determine from Hyland's inconclusive financial records. In her sworn affidavit, Sinervo states the following:

> I had been asked previously by Ed Meek to take a look at Mr. Hyland's financial records for his 2009 Agrisouth, an agricultural tradeshow and exhibition that was held at the Agricenter in Memphis, TN. Dr. Meek was considering purchasing the show. After waiting several weeks and seeing several sets of numbers, Mr. Hyland provided me with his "final" draft of the financials on the morning of March 3, 2010. After a [sic] examination of these records, I had serious questions about whether or not Mr. Hyland had been truthful in his representations to Dr. Meek, Mrs. Robinson and myself about the success of his 2009 tradeshow. I ultimately concluded that the show was not what Mr. Hyland had described, and would not justify the $40,000 draw against future profits that Mr. Hyland asked for.
>
> . . . .
>
> Mr. Hyland never explained what was included in his A/R summary. The figures he did provide did not answer my questions about what monies were owed from the previous show and what was future income. His A/R report (see Exhibit C) indicates that as of February 16, 2010, he had $42,596.25 in outstanding invoices. The detail report covering that same period indicates that he invoiced $69,269.13 for what appeared to be booth space at his upcoming show. No cash receipts journal was provided and it was impossible for me to determine what was past due, what was currently due, and what income for the 2010 show had actually been collected.
>
> . . . .
>
> From Mr. Hyland's description, only a small portion of the money owed was for the 2009 show leaving me to understand that the bulk of it was future income for the 2010 show. Having the income and, I assume, expenses from the 2009 and 2010 shows intermingled on the financial statements made it impossible to get a clear picture of how profitable his 2009 show had actually been. I noted, too, that the expenses included nothing for compensation of Mr. Hyland, who, by his own account, had done almost all of the work of putting on the show. Any true picture of the show's profitability would have to show, as an expense, the compensation for those who did the work. I therefore deducted the $41,157.91 that Mr. Hyland had shown elsewhere as his "draw." The result was a net profit, actually

collected, of only $11,395.35 - - a far cry from the $30,000 figure that Mr. Hyland had initially represented.

Stephanie Jones, who was employed by Hyland from October, 2009 until March, 2010, as a graphic designer, commented on the financial stability of Hyland's business in a transcribed interview which was incorporated into her sworn affidavit. Pertinent questions and answers are set forth as follows:

Q.    Do you know anything about his business?

A.    I don't think it's real solid. I don't know details, but I know it's kind of a - - he works on kind of a sell-to-sell basis. You know, I don't think he had any great capital or anything.

. . . .

Q.    Did you attend the show?

A.    I did. In November I was there. The one, the first one in Memphis.

Q.    And that's the first show he did or?

A.    Yes, his first show.

Q.    Ever?

A.    Ever done. Had no background in trade shows whatsoever.

. . . .

A.    It was, at the Agricenter.

Q.    Okay. The – tell me about the show.

A.    The show was successful as far as exhibitors. I think we had a good show. But as far as attendance, it was awful.

9

. . . .

Q.    And the attendance would have been the people who came?

A.    People who showed up. It was very very low. A couple hundred people.

Q.    A couple hundred?

A.    Yeah. And I mean, you know, with a show like that you want several thousand.

Q.    How many exhibitors did y'all have?

A.    I think it was just short of 150.

Q.    You had 150 exhibitors and 100 - -

A.    Well, it wasn't 150 exhibitors. It was 150 booths, so some of them had multiple
      booths.

. . . .

Q.    Okay. And that was his first show ever?

A.    That was his first show. He had never - - he had been to some trade shows
      because he was a tree broker. His uncle owns a tree farm, and he brokered trees
      and went to a few shows and saw an opportunity.

. . . .

Q.    And he does a monthly magazine?

A.    He did. We did when I was there.

Q.    What do you mean?

A.    The last - - and actually the last one I designed he did not have printed because he
      did not have the money to fund it.

Q.    When was that?

A.    That would have been the March edition.

Q.    Okay.

A.    No. That would have been the February edition, I think. It did not go out.

Q.    How long had he been in the business?

A.    Been in the trade show business?

Q.    Yeah.

A.    Maybe a couple of months before I started.

Q.    Okay.   What about his - - what about the agri business and all?

A.    That was his first foray into anything media.

. . . .

Q.    Oh, really?  What about financial information?  Could you - -

A.    Jason's financial information?

Q.    Yeah.

A.    I do not know about his financial.  I don't know any specifics other than he

      couldn't afford to pay his staff, so I can't imagine he was very solid financially.

Q.    How do you know he couldn't afford to pay his staff?

A.    He said so himself.

. . . .

Q.    Before that March meeting what had you heard about any kind of deal?

A.    Like I said, at first he said he was going in 50/50 with Ed.  He would be CEO of

      the company.  He's very boastful, and so I guess you kind of have to take anything

      that he said, you know, I kind of waited to see.  Because Ed, of course, has a very

solid reputation as having, you know, very successful businesses. I knew Jason

did not have a lot of experience, and I was very skeptical as for him being CEO of

a business that he knew very very little about.

Q.     Okay. So you just heard? It was just talk?

A.     It was all talk. And I know from him, you know, he would get very frustrated

because Ed would say, you know, we've just got to wait and see. And, you know

- - and I think he was very shocked when Ed asked to actually look at his books

because he thought Ed was just going to offer him the opportunity without ever

going into his financial records. I do know that he opened up his financial records

with, you know, he offered them to him with no hesitation.

Q.     Jason did?

A.     Jason offered Ed before Ed actually made him an offer. Because, you know, he

was a little shocked that they wanted to see, you know, his finances. But he did,

as far as I know, show him.

Q.     Why was he shocked to show him his finances.

A.     I think he thought - - he really was arrogant enough to think that Ed was just going

to, you know, give him this huge position without any - - without saying, okay, I

need to know a little bit more about you.

The court recognizes that this affidavit and transcription were not subject to cross

examination. However, there has been nothing offered to contradict or discredit the accuracy of

Jones' comments.

## C. Ancillary Events

After the conclusion of the AgriSouth trade show in November, 2009, Meek and Hyland discussed various business proposals on several occasions. In his affidavit, Hyland stated that at one point Meek offered and he accepted a 60% ownership in Hyland Expositions which included the Broadband Expo. As mentioned briefly above, the Hyland Expositions venture never materialized.

Hyland asserted that he spent approximately $8,680.48 in the early stages of developing a trade show called The Ultimate Business Forum, but he abandoned this project at Meek's demand. However, when questioned at his discovery deposition, Hyland acknowledged that Meek had only said, "I think I told you that from the start. Your idea of a job show is a long shot, one that I think has great potential to wipe you out." (See page 285, deposition of Jason Hyland, Vol. II.) Contrary to Hyland's contention, the court does not perceive this to be an overreaching tactic by Meek at all. Although no one will know for certain, Meek's advice to Hyland about The Ultimate Business Expo could well have been an accurate assessment of the possibilities of financial success for this particular venture from a man who had a proven "track record" in producing successful trade shows.

In his affidavit, Hyland indicated that he gave up his ownership interest in AgriSouth for the opportunity to participate in Oxford Expo. This assertion has no basis in fact. As events ultimately unfolded, Hyland retained the ability to do whatever he wanted with AgriSouth. This is evidenced by Hyland's March 15, 2010 e-mail, which is mentioned later in this opinion.

13

## D. Formalizing the Contract Provisions

Although there were other ideas considered by Meek and Hyland, they have nothing to do with the resolution of this adversary proceeding. As set forth hereinabove, the parties agree that the primary issue is whether Meek's February 11 e-mail to Hyland formed a binding contract when it was accepted by Hyland. This e-mail was essentially an outline of a complex business proposal which required the "formalizing" of numerous intricate details. Meek obviously recognized this in his February 8 e-mail to Hyland and Robinson, as well as, in his later e-mail to Sai Ireland, at Butler Snow, so that Ireland could structure the proposal through the preparation of the contractual agreements. This e-mail, which was dated February 11, reads as follows:

> Sai,
>
> Here is the deal in general terms.
>
> Assets include a show, website, social network on web, name, logo, data bases, etc.
>
> Ed

(emphasis supplied).

(Attached to this e-mail was the full text of the February 11 e-mail that Meek had sent to Hyland.)

Even Hyland, in his Statement of Material Facts, recognized that the proposed transaction would require multiple agreements. At paragraph 48, Hyland asserted that the following was a material fact, to-wit:

> 48. The Butler Snow law firm drafted a document that clearly set forth Hyland's 10% ownership interest in Oxford Expositions acknowledging that the terms of the deal were sufficiently definite as of February 11, 2010 to permit the law firm (to) include such in a document. The document drafted by Butler Snow included, in part, the following:

2. *Purchase Price. **As consideration** for the convenants* [sic] *and obligations contained herein, Oxford Expositions agrees to pay to Hyland Media as follows:*

(a) *Oxford Expositions **shall pay $40,000.00 upon delivery and execution of the Agreement** ("the Down Payment"). At the conclusion of the 2010 AgriSouth Show, Oxford Expositions shall pay the balance of any net profits, as determined by Oxford Expositions' independent accounting (the "Net Profits") up to $100,000 less the down payment and the total amount due under that certain Note Payable dated _____, 20 (the "Note"). Oxford Expositions shall retain any Net Profits form* [sic] *the 2010 AgriSouth show in excess of $100,000.00.*

(b) ***Hyland shall receive 10% interest in Oxford Expositions** as specified in that certain Limited Liability Agreement for Oxford Expositions, LLC dated as of _____, 2010 (the "LLC Agreement").*

(c) ***Hyland shall be employed by Oxford Expositions as executive Vice-President** under the terms and conditions specified in that certain Employment Agreement dated _____, 2010 (the "Employment Agreement").*

. . . .

3. *Right to Repurchase. Hyland Media **shall have the option to repurchase** the Assets in the event that (i) Oxford Expositions is unable to continue as a going concern; or (ii) Hyland's employment at Oxford Expositions is terminated pursuant to the Employment Agreement.*

Ironically, this particular draft proposes that Oxford Expo would pay consideration to Hyland Media, which was not an incorporated entity at that time. In addition, the draft contemplates that Hyland's 10% interest in Oxford Expo would be "specified" in a Limited Liability Agreement for Oxford Expositions, LLC, as well as, that Hyland would be employed by Oxford Expo as Executive Vice President under the terms and conditions specified in an

Employment Agreement. This clearly shows that there were many significant issues that had to

be incorporated with specificity in not only the "umbrella" contract, but also in a separate limited

liability corporation agreement and a separate employment agreement. The deposition testimony

of Sai Ireland is critically important in enumerating the various items that had to be addressed

before these documents could have legally binding effect, to-wit:

Q	(Mr. Foster) What was your role or what did Dr. Meek ask your role to be
	in getting Oxford Expositions up and going?

A	To serve as his counsel and to assist in the formation and organization of
	the entity, and then to assist him in identifying the issues that needed to be
	addressed to reach an agreement to carry out these proposed business
	plans.

Q	Okay. And - - strike that. Did that - - did your role involve either yourself
	drafting or overseeing the drafting or having any part in the drafting of,
	let's say, employment agreements?

A	Uh - - yes. When I received the e-mail, I contacted Ed and asked him how
	he wished to proceed. Ordinarily, what I would do would be to identify
	the issues that were not addressed and make recommendations to Ed on
	how to address those issues, maybe make recommendations on how to
	better address the issues that were identified and then find out a time-
	frame, and then either draft or task someone else to begin drafting the
	initial versions of those documents.

. . . .

Q	(Mr. Frey) All right. Sir, do you have a general understanding of Mr.
	Hyland's claims?

A	I do.

	MR. FOSTER: Object to the form.

Q	(Mr. Frey) What is your general understanding?

A.	That the February 11th e-mail, and I'm sorry, I don't recall the exhibit
	number.

Q    It's actually Exhibit 5.

A    Exhibit 5 is a binding contract between Oxford Expositions and Mr. Hyland.

Q    And do you have a view on that?

A    I do.

Q    What is that view?

A    That that e-mail represents a snapshot of the status of negotiations between Mr. Meek and Mr. Hyland as of that date. It does not represent a binding contract.

Q    Would you describe it as a step in a process?

        MR. FOSTER: Object to form. More to strike.

A    Yes.

Q    (Mr. Frey) Well, I'll ask it this way: What would you describe it as? I mean if that - -

A    Uh - - you cannot negotiate an agreement of any complexity and have all of the terms agreed upon simultaneously. It's impossible. So it's a snapshot of the status of the negotiations as of that time and the business plans as of that time with the intention that there would be further negotiations and a process would ensue with the intention of ultimately, you know, nothing is agreed until everything is agreed.

Q    Is it contemplated that at some point there will be drafts to give to Mr. Hyland and his lawyer?

A    Yes.

Q    And in the normal course of things, what would have happened next?

A    I would review the e-mail, discuss with Ed what issues were identified; make suggestions on how better to handle issues, spot issues that weren't identified. And at some point, we would prepare drafts. We would review those drafts with Ed, make whatever changes were requested and/or

17

recommended, and then deliver those drafts to Mr. Ireland [sic] and his attorney.

Q    And then in the normal course of that, what happens next?

A    We would receive comments from Mr. Hyland, react to those, negotiate the documents. There may be other issues that come out of that process; ultimately, concluding it successful in written agreements that would be executed, delivered, and then transactions would be consummated or not.

Q    Have you worked on deals that got as far as the February 11 e-mail that did not come to a binding agreement?

A    Yes.

. . . .

Q    You mentioned "the show." It says there in the second paragraph, "I propose to buy your show." Do you see that?

A    Yes.

Q    As a corporate lawyer, are you able to take that and put it directly into an agreement without further input from the parties? What is "a show"?

A    Well, you have to define, you know, what's meant by what's being acquired. You know, ordinarily, in, you know, the way this lays out, you know, he's talking about buying assets. He's not talking about buying the, the legal entity, which I'm not even sure is mentioned in here, or we actually don't know who owns the show at that point, but - - uh - - so it's an asset. What's proposed is the purchase of assets. You have to understand what assets are included and which ones are not included, if any; which ones are personal, you know, that sort of thing. So that's not specified in this e-mail.

Q    What about who is going to control this new entity? Does that e-mail tell us that?

      MR. FOSTER: Object to form to determine new entity without further specifying what the new entity is.

      MR. FREY: Right. Fine.

18

Q     (Mr. Frey) What about Oxford Expositions? Does this February 11th e-mail tell who's going to control it?

A     The e-mail only references that Jen would be CEO, and it says "you will assume," meaning Jason, "will assume title of executive vice president." It doesn't say anything about, you know, the board of directors or the ultimate authority.

Q     In the ordinary course of events, would you have drafted an LLC agreement and negotiated all of those things?

A     Yes.

Q     And did, in the ordinary course of events, would there have also have been an asset purchase agreement and an employment agreement?

       MR. FOSTER: I object to form. Move to strike. It's leading.

A.    Well, I recommended all of those to Ed that there be written agreements for employment, that there be an asset purchase agreement to define what was being acquired, what wasn't being acquired, what liabilities would be assumed, if any; that sort of thing.

Q     (Mr. Frey) Turn to the end of this e-mail, February 11th. Read that last sentence, please?

A     "Please confirm your acceptance, and I'll have Butler Snow draw up an agreement."

Q     What is the significance to you, as corporate lawyer, about asking your lawyers to draw up an agreement?

A     In my experience in real life what happens is that the businessmen get together and reach a point in their negotiations, and then they turn it over to an attorney on one side to prepare a proposed document or documents, and you go through the process of, of - - uh - - you know, I guess concluding a draft on your side, sending it to the other side and, ultimately, negotiating those agreements. So I think it's in line with customary practice of - - uh - - of this e-mail being a snapshot in time of the status and negotiations subject to ultimate agreements that would be drawn up and negotiated.

19

Q       And you said something earlier and I have already forgotten about.
        Something being agreed or not agreed until everything - - what did you
        say?

A       The normal, customary practice in negotiating complex business
        transactions is that nothing is agreed until everything is agreed.  You can't
        negotiate everything at the same time.

. . . .

Q       Would you read that and the next one, please?

A       "Incentives based on performance and profitability will be included for
        you and Jen.  I know Jen well enough that she, like you, wants incentives
        and to be rewarded based on performance, and both of us know that
        incentives are critical to development of a highly motivated team."

Q       Could you, as a corporate lawyer, just take that language and then pop out
        an agreement that reflected whatever they - -

A       Well, you don't know what incentives are called for there.  And there's as
        many different ways to provide incentives to employees as there are
        employees, so.

Q       And in the ordinary course of events, what would have happened with that
        thought?

A       Well, I would have had a conversation with Ed about what he had in mind.
        We would have included that on our draft agreement that would have been
        delivered to the other party and their counsel.  They would have
        commented on it, presumably, if they disagreed, and we would have
        negotiated the terms.

Q       Sir, if you would turn back on the first page of Exhibit 5, it says in the
        third paragraph, "You will need to provide the budget that you have
        created."  Do you see that?

A       Yes.

Q       And I think I saw a draft agreement that called for some exhibits, and one
        of them was a budget.  Am I right about that?

A       Yes, I believe - - uh - - that we prepared a draft. We sent it to Ed. and then not long thereafter we're told that, that Mr. Hyland was no longer involved in the business that was being created. But that draft had a variety of different open items in it, and one of which I believe was the budget.

. . . .

Q       Okay. Would you consider the 10 percent ownership to be a material term of any contract? Of a contract between Mr. Hyland and Dr. Meek and Oxford Expositions?

A       Well, the answer is yes and no. Yes, the 10 percent is important, but the nature of the interest and ownership and the nature of the entity is not specified. So in and of itself, 10 percent interest and ownership is incomplete.

. . . .

Q       (Mr. Foster) I believe the question asked by Mr. Frey was, and the ultimate question asked by Mr. Frey was, in your opinion, and it may not be verbatim, trying to be as accurate as I can, in your opinion was there a binding agreement reached between Mr. Hyland and Dr. Meek, Oxford Expositions, whomever? That was my understanding of the ultimate question asked, and my follow-up is if there - - and back up - - your response to that was no for a better lack of terms; correct?

A       That is correct.

Q       Okay. So the follow-up is if Mr. Hyland expended monetary capital into the starting or formation of Oxford Expositions, would that change your opinion?

A       If Mr. Hyland contributed capital to a business in return for an ownership interest, then I would say yes. If he incurred costs in pursuing negotiations with Mr. Meek, then, in and of itself, I would say no.

Ireland enumerated several conditions outlined in Meek's February 11 e-mail to Hyland that would have to be "fleshed out" in the contract documents. In a multi-faceted transaction such as the one contemplated, the court can logically presume that other provisions would have

to be negotiated, for example: (1) specific conditions of employment such as a covenant not to compete and an agreement not to solicit Oxford Expo customers upon cessation of employment; (2) the specific amount of the employees' salaries; (3) potential restrictions on the transfer of the equity or ownership interests in Oxford Expo; (4) buyout terms should an owner wish to sell his or her interest; and (5) criteria or benchmarks of performance for purposes of calculating future incentives based on performance. These type conditions would likely be included in the limited liability corporation agreement or the employment agreement, which by necessity would be component parts of the "umbrella" contract.

### E. Events Leading to the Relationship Termination

After Meek sent the February 11 e-mail to Hyland and then the follow-up e-mail to Sai Ireland at Butler Snow, he initiated the due diligence investigation regarding the proposed transaction through Cindy Sinervo and Jennifer Robinson, both of whom were intimately familiar with the financial underpinnings of trade shows. As discussed earlier, the inquiries into Hyland's business records revealed a completely different picture than had been represented by Hyland. The AgriSouth trade show was not well attended by non-vendors, and the net profits had been significantly overstated. Neither the AgriSouth Expo nor Hyland Media Company, LLC, the latter of which Hyland had represented himself to be President on his e-mails, were even incorporated entities. A reasonably accurate assessment of Hyland's financial condition was developed by Sinervo as reflected in her affidavit. This was corroborated through the transcribed interview of Hyland's former employee, Stephanie Jones. By February 24, 2010, Meek's concern about the transaction had intensified. On this date, Meek sent an e-mail to Barry

22

Cannada and Sai Ireland at Butler Snow, as well as, to Jennifer Robinson, wherein he stated the following:

> I have agreed to purchase Jason's Agri-South show on the bases [sic] of profits for his 2010 event. Specifically, he will received [sic] all profits up to $100,000 and we will give him 10 percent ownership in The Broadband Expo under which we will position Agri-South which he will continue to manage while working in the broadband venture. I am increasingly concerned that this young man can be a strong contributor or a problem, and if the latter is the case, I will want to move him out quickly. His show has little or no value, and is not necessary to my business plan. I have taken him under my wing to help him and offered him what is a pretty good deal which I want him to have IF he performs well as a member of the team. He has always been independent and owned his ventures and there is some evidence he will not be a good fit so I want to fulfill my obligation to him if and when he fulfills his obligation to the company. A stock arrangement where he gets his stock based on performance, as you suggested, is a good option. He probably will not like this and if not, my options will be to have no relationship with him or perhaps buy his show outright for cash with no stock. Regardless, I think it best I get this on the table now rather than later.

Later, on February 24, 2010, Meek sent an e-mail to Hyland which contained the following excerpts:

> I am sorry it is taking so long to put all the pieces together but I trust the lawyers will have everything in place soon. I am grounded, because of my double vision, or I would be there to discuss all of this with you. I want to update you on a wide range of issues which are not done deals but which are cooking; all of which should be confidential between you, me and Jen.
>
> . . . .
>
> As you know Reed is a major player with resources we can only dream about. I am convinced that joint ventures with them make more sense than going alone. But here is an issue that has come up and I want to be upfront [sic] with you about it now so you can know as much as I know about where this appears to be going. Reed wants Jen and me as partners in the nightclub and CaterSource ventures. I am unable to put you in to [sic] these but I can plug you into Agri-South and The Broadband Expo LLC just as discussed. Bottom line, I can't get you ownership in the beverage and food events as you have no track record with Reed.
>
> Two companies are being established: Oxford Expositions LLC which will own 80 percent of The Broadband Expo LLC and Agri-South. Oxford Expositions

will joint venture with Reed on Nightclub and CaterSource, if these plans actually come to pass. Jen and my family will have sole ownership of Oxford Expositions LLC while you and Roy each will have 10 percent of The Broadband Expo LLC. I apologize for the shifting nature of developments but I have to take the opportunities where I see them for the best interest of all of us.

In his cross-motion for summary judgment, Hyland contends that the aforesaid e-mail

from Meek to him on February 24 constituted a breach of the contract that he had accepted on

February 11. Seemingly unperturbed, Hyland acknowledged that the terms of the transaction had

changed in an e-mail that he sent to Jennifer Robinson, Cindy Sinervo, and Meek on February

28, 2010.

The attorneys at Butler Snow were still working to prepare drafts of the contract

documents on March 1, 2010. Illustrating the uncertainty of some of the details of the proposed

transaction is an interoffice e-mail from Kenneth A. Primos to Sai Ireland, dated March 1, 2010,

which provides the following:

Sai,

Attached are links to a draft of the purchase agreement for the AgriSouth trade show as well as a redline comparing this to the Nevada Restaurant deal (OxPub).

There are a few details to fill in once we have the information. I noted a couple of items within the document, but one item that needs to be addressed is what does it mean for OE to fail and thus give Hyland the right to repurchase the AgriSouth trade show? Ed seems to want use this as a vehicle for the broadband show and possible some other deals and I was a bit unsure of how to define such a "failure".

I wanted to get this to you as we told Ed that we would get him a draft today even though there may be other details we need to drop in. I'm available to discuss anytime. Other than that, I will continue to work on the employment agreement for Jason and Jennifer.

-Kap

Hyland obviously did not accept the proposal outlined in Meek's February 24 e-mail.
According to Stephanie Jones' transcribed interview, Hyland told her and two others who
worked for Hyland that he had rejected Meek's offer and appeared offended because the terms
were insufficient. On March 15, Hyland e-mailed Meek and stated the following:

> Ed,
>
> Per our agreement with one another on this office space, I am sending you my 30
> day intent to leave notice. We will be moving back into our offices on the square.
> We will have all of our belongings out within 30 days from today. I appreciate all
> you have done for me! If you need anything of me, please let me know.

In a second e-mail on March 15, Hyland wrote Meek indicating that he recognized that
the proposed business relationship with Oxford Expo was now over, but he wished Meek well.
This e-mail is set forth as follows:

> Ed,
>
> Nothing against you! I TRULY respect and believe in you and your endeavors. I
> want you and I to stay close and friends. I have really enjoyed all the conversation
> and idea swapping. Please know that you have an open line of communication
> with me at all times and I see you as a great man. A family man, in which I aspire
> to be! As you are aware, both Stephanie and Rayna will be on board with you.
> They both had my blessing to do so as I truly care for their well being and
> immediate income situations. The obvious though is I only have my one show,
> which is an excellent one! I will feel more comfortable being back in my office,
> building my trade show empire one brick at a time. I will do anything to help you
> as you have helped me. I am dealing well with my personal issue and you will
> soon see that this bump in the road will not stop me, just slow me down. You are
> truly an inspiration to me and will use that to build bigger and better shows,
> events and ideas in the future. I am going to re staff on a smaller scale and make
> AgriSouth 2010 a great show for the industry and myself. I am an entrepreneur
> and will make you proud of my achievements in the near future. Good luck with
> your new launches and I wish you guys the best. I am implementing a few tricks I
> learned from you and will have other shows in progress soon. I am an extremely
> talented and skilled idealist, realist and achiever. So are you! Go get em'
>
> PS. I didn't use the chancellors advice to keep the emails short and sweet, ha

To Our Successes,

Jason Hyland

This e-mail indicates without question that Hyland contemplated that he, not Oxford
Expo, would be producing the AgriSouth show in 2010.

## III.

## DISCUSSION OF LEGAL ISSUES

In his legal memoranda, Hyland relies primarily on the decisions in *Busching v. Griffin*,
542 So.2d 860 (Miss. 1989), and *Vicksburg Waterworks Co. v. J.M. Guffy Petroleum Co.*, 38 So.
302 (Miss. 1905), in support of his contention that the February 11 e-mail constituted a binding
contract.

In *Busching v. Griffin*, 542 So.2d 860, the court was asked to decide whether an option
contract to purchase real property was a binding agreement or whether it was simply an
agreement to enter into a contract at a later date. The parties had executed a signed, written
option agreement for the purchase of real property, which was recorded in the appropriate county
land records, and later twice extended. When the purchaser gave notice of his intent to exercise
the option, the landowner refused, claiming that she thought the option was merely security for a
loan made to her, and that the written agreement was too vague to be enforceable. The trial court
determined that the contract was too uncertain to enforce, based largely upon the landowner's
testimony that she thought the option was security for a loan made to her to pay her taxes. On a
second appeal, the Mississippi Supreme Court reversed, finding that the trial court erred in its
determination of whether the terms of the agreement were sufficiently definite enough to support
a decree of specific performance. *Id.* at 861.

The agreement in *Griffin* was titled "Option to Purchase" and its written terms described

the property to be conveyed, provided for a total purchase price of $50,000.00 to be paid if the

option were exercised, and stated that "the terms of such sale will be provided in an agreement to

be exercised between" the parties. *Id.* It further provided that if the option were to be exercised,

the parties would "perform the obligations in the form of agreement to be made between them."

*Id.* Although there were terms not settled in the option contract, such as the terms of the

purchase agreement to be created if and when the purchaser chose to exercise the option, the

contract included a total purchase price of $50,000.00 to be paid to the landowner upon exercise

of the option. The court concluded that when the purchaser testified that he was able to pay the

sale price in cash, he eliminated any possible concern caused by ambiguity, because the "key

term whose specificity must appear is the purchase price . . . ." *Id.* at 864.

Additionally, the court reiterated its policy regarding agreements to agree as established

in *Jones v. McGahey*, 187 So.2d 579 (Miss. 1966), wherein it stated:

> Determination that an agreement is sufficiently definite is favored in the courts, so
> as to carry out a reasonable intention of the parties if it can be ascertained. A
> contract is sufficiently definite if it contains matter which will enable the court
> under proper rules of construction to ascertain its terms, including consideration
> of the general circumstances of the parties and if necessary relevant extrinsic
> evidence. Having found a contract to have been made, an agreement should not
> be frustrated where it is possible to reach a reasonable and fair result.

*Id.* at 584 (citations omitted).

The court further stated that the above theory was not a novel one, and referenced its

decision in *Vicksburg Waterworks Co. v. J.M. Guffy Petroleum Co.*, 38 So. 302 (Miss. 1905),

where it noted that:

27

[A] stipulation to reduce a valid written contract to some other form does not affect its validity, and the stipulation may not be used by either of the parties for the purpose of . . . evading the performance of any of the provisions of the contract.

*Id.* at 304.

This court concurs with the logic of the *Griffin* opinion. The case involved an option contract that had been reduced to writing and recorded. The terms were sufficiently explicit to form an unambiguous contract.

However, the facts in *Griffin* are obviously distinguishable from the facts in the subject adversary proceeding in which a very complex and technical transaction was contemplated. As enumerated earlier, there were material contract provisions that had to be refined and particularized in multiple documents. In his e-mails, specifically the February 8 e-mail, Meek expressly indicated that he and Hyland would consider all of the provisions when they were provided to them by the attorneys at Butler Snow. Indeed, from all indications, the parties contemplated that there would be at least three contracts drafted - the asset purchase agreement, the limited liability corporation agreement, and the employment agreement.

The Mississippi Supreme Court in *Etheridge v. Ramzy*, 276 So.2d 451 (Miss. 1973), and *WRH Properties, Inc. v. Estate of Johnson*, 759 So.2d 394 (Miss. 2000), more appropriately addressed the factual circumstances that are present before this court.

*Etheridge v. Ramzy*, 276 So.2d 451, involved a dispute over a written document titled "Buy and Sell Agreement - letter of intent" that was signed and witnessed by both parties. *Id.* at 451. This document stated the terms of an earlier oral option agreement in lengthy and specific detail, and also called for "a formal buy and sell agreement" to be subsequently created. *Id.* at

28

452. When the buyers drafted and tendered the "formal buy and sell agreement," the sellers refused to either sign it or to perform under its terms. *Id.* at 453. The buyers then brought suit to compel, and the trial court found that no contract ever existed because the letter agreement was too indefinite upon its essential terms to be enforced. *Id.* at 451.

This was the sole issue on appeal to the Mississippi Supreme Court, which held that in order to be enforceable, an agreement must be definite and certain. *Id.* at 453. The court found that despite the detailed terms contained therein, the letter of intent document was merely "a memorandum expressing an intent to enter into a future contract," as opposed to being an enforceable agreement. *Id.* at 453-54.

The court noted that the letter called for a formal buy and sell agreement to be drafted, in which there were to be certain covenants regarding the maintenance of an adequate net worth to indebtedness ratio, as well as, various other covenants to control the amount of salaries and dividends to be paid. *Id.* at 454. The court considered the importance of these provisions and found that it was "obvious that further negotiations must have been contemplated on the terms of the letter," and thus it was "nothing more than a memorandum of intent" and unenforceable. *Id.* at 456.

Further, the court made the following pertinent observations:

[U]nless an agreement to make a future contract is definite and certain upon all the subjects to be embraced, it is nugatory. To be enforceable, a contract to enter into a future contract must specify all its material and essential terms . . . If any essential term is left open to future consideration, there is no binding contract, and an agreement to reach an agreement imposes no obligation on the parties thereto.
. . . .

29

> If the document or contract that the parties agree to make is to contain any material term that is not already agreed on, no contract has yet been made; and the so-called 'contract to make a contract' is not a contract at all.

*Id.* at 454.

The court recognized the existence of authority indicating that contracts should receive a reasonable construction in order to determine the intent of the parties, as well as, the doctrine of *id certum est quod certum reddi* (that is certain which can be made certain). *Id.* at 455-56. However, it agreed with the trial court's decision that neither applied here, as the covenants mentioned in the contract were "essential elements of the agreement" and concluded that they were too indefinite and uncertain to allow enforcement. *Id.* at 454-456.

In *WRH Properties, Inc. v. Estate of Johnson,* 759 So.2d 394, the alleged contract at issue was an oral agreement to settle a pending lawsuit. It had been recorded and later transcribed, thus eliminating any dispute as to what was actually said. *Id.* at 395.

The Mississippi Supreme Court reversed the trial court's decision that the parties intended to be bound by the terms of the oral agreement, and found the language to indicate that the parties "may have reached an agreement in principle, but it was obvious that the lawyers would have to eventually work out the details. Those details were never worked out." *Id.* at 397. Since the contract dealt with assets of an estate, the court found that if the parties had intended the settlement agreement to be binding, it would have required the approval of the chancery court before it became effective. *Id.* Following an examination of the particular circumstances in the case, the court concluded that no present intention to be bound existed. The court held that the parties "intended that their agreement in principle to be reduced to writing before it was binding." *Id.*

In so holding, the court noted that "[w]hether contracting parties are bound by an informal agreement prior to the execution of a contemplated formal writing is a matter of intention to be determined by the surrounding facts and circumstances of each particular case." *Id.* at 397. The court then identified several helpful factors for determining the parties' present intention to be bound. They included:

> (1) whether the contract is usually one put in writing; (2) whether there are few or many details; (3) whether the amount involved is large or small; (4) whether it requires a formal writing for a full expression of the covenants and promises; and (5) whether the negotiations themselves indicate that a written draft is contemplated as the final conclusion of negotiations. Each of the circumstances listed above must be answered in the positive in the instant case.

*Id.* (citations omitted).

When each of these five factors is applied to Meek's February 11 e-mail, it is abundantly clear that this e-mail was only an informal outline of more formal agreements to be drafted subsequently by the Butler Snow attorneys. There were many material details that were integral to this overall transaction that had to be first negotiated, reduced to writing, and then agreed upon. As such, even though it was telephonically "accepted" by Hyland, the February 11 e-mail, standing alone, can not be considered a binding contract by this court.

IV.

## STANDARDS FOR SUMMARY JUDGMENTS

Summary judgment is properly granted when pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Bankruptcy Rule 7056; Miss. Bankr. L.R. 7056-1. The court must examine each

31

issue in a light most favorable to the nonmoving party. *Anderson v. Liberty Lobby*, 477 U.S.

242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Phillips v. OKC Corp.*, 812 F.2d 265 (5th Cir.

1987); *Putman v. Ins. Co. of N. Am.*, 673 F.Supp. 171 (N.D. Miss. 1987). The moving party

must demonstrate to the court the basis on which it believes that summary judgment is justified.

The nonmoving party must then show that a genuine issue of material fact arises as to that issue.

*Celotex Corporation v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.29 265 (1986); *Leonard*

*v. Dixie Well Serv. & Supply, Inc.*, 828 F.2d 291 (5th Cir. 1987), *Putman v. Ins. Co. of N. Am.*,

673 F. Supp. 171 (N.D. Miss. 1987). An issue is genuine if "there is sufficient evidence favoring

the nonmoving party for a fact finder to find for that party." *Phillips*, 812 F.2d at 273. A fact is

material if it would "affect the outcome of the lawsuit under the governing substantive law."

*Phillips*, 812 F.2d at 272.

Although the parties dispute how the material factual issues should be considered by the

court, they do not dispute the existence of these facts.

## V.

## CONCLUSION

In summary, the aforementioned conclusion of the court is based on the following

undisputed facts, to-wit:

A.    In his February 8 e-mail, Meek informed Hyland that the "ins and outs" of the

transaction would be structured by the Butler Snow attorneys.

32

B. The February 11 e-mail clearly implied that there were material details that needed to be identified, addressed, negotiated, reduced to writing, and then agreed upon. These undecided issues, which would be incorporated into the multiple contract documents, would likely include some of the following:

1. The identity and value of the assets being acquired by Oxford Expo.

2. The salary amounts for Hyland and the other employees.

3. The terms of performance incentives and/or other compensation enhancements such as bonuses or periodic raises.

4. Other benefits such as medical, disability, or life insurance.

5. Covenants not to compete and non-solicitation provisions should there be a cessation of employment.

6. Restrictions on the transfer of equity or ownership interests in Oxford Expo, which would include buy-out provisions should an owner wish to sell his or her interest in Oxford Expo.

7. A provision related to confidentiality concerns.

8. The structured hierarchy of Oxford Expo including the responsibilities, duties, and authority of Hyland.

C. The fact that there was a "due diligence" investigation undertaken subsequent to the February 11 e-mail is an indication that the parties, particularly Meek, did not consider that a binding contract was already "in place." The unsettling results of this investigation were described above.

33

D.    The testimony of Attorney Sai Ireland was compelling in describing how the

contract formation process would unfold, as well as, his opinion of the February

11 e-mail, to-wit:

> Uh - - yes. When I received the e-mail, I contacted
> Ed and asked him how he wished to proceed.
> Ordinarily, what I would do would be to identify the
> issues that were not addressed and make
> recommendations to Ed on how to address those
> issues, maybe make recommendations on how to
> better address the issues that were identified and
> then find out a time-frame, and then either draft or
> task someone else to begin drafting the initial
> versions of those documents.
> . . . .
>
> That that [sic] e-mail represents a snapshot of the
> status of negotiations between Mr. Meek and Mr.
> Hyland as of that date. It does not represent a
> binding contract.
> . . . .
>
> Uh - - you cannot negotiate an agreement of any
> complexity and have all of the terms agreed upon
> simultaneously. It's impossible. So it's a snapshot
> of the status of the negotiations as of that time and
> the business plans as of that time with the intention
> that there would be further negotiations and a
> process would ensue with the intention of
> ultimately, you know, nothing is agreed until
> everything is agreed.
> . . . .
>
> Well, I recommended all of those to Ed that there be
> written agreements for employment, that there be an
> asset purchase agreement to define what was being
> acquired, what wasn't being acquired, what
> liabilities would be assumed, if any; that sort of
> thing.
> . . . .

In my experience in real life what happens is that the businessmen get together and reach a point in their negotiations, and then they turn it over to an attorney on one side to prepare a proposed document or documents, and you go through the process of, of - - uh - - you know, I guess concluding a draft on your side, sending it to the other side and, ultimately, negotiating those agreements. So I think it's in line with customary practice of - - uh - - of this e-mail being a snapshot in time of the status and negotiations subject to ultimate agreements that would be drawn up and negotiated.

E.     Hyland retained the AgriSouth show and had plans to produce it in 2010. The

comments that he made in his March 15 e-mail are illustrative:

> . . . You are truly an inspiration to me and will use that to build bigger and better shows, events and ideas in the future. I am going to re staff on a smaller scale and make AgriSouth 2010 a great show for the industry and myself. I am an entrepreneur and will make you proud of my achievements in the near future. Good luck with your new launches and I wish you guys the best. I am implementing a few tricks I learned from you and will have other shows in progress soon. . .

F.     The Mississippi Supreme Court decisions in *Etheridge v. Ramzy*, 276 So.2d 451,

and *WRH Properties, Inc. v. Estate of Johnson*, 759 So.2d 394, closely fit the facts

of this adversary proceeding. The opinions are instructive that the February 11 e-

mail was only an outline of a transaction to be subsequently formalized and

structured by the Butler Snow attorneys.

As a result of the foregoing analysis, the court concludes that the motion for partial summary judgment filed by Oxford Expo is hereby sustained. The February 11 e-mail is not a binding contract. The cross-motion for summary judgment filed by Hyland is not well taken and will be overruled.

Since only the motion for partial summary judgment was sustained, the court will conduct a status conference with the parties to address any other matters that might be involved in this proceeding, as well as, to discuss the status of the companion adversary proceeding, No.11-1010-DWH.

A separate judgment consistent with this opinion will be entered contemporaneously herewith.

This the 19th day of April, 2012.

DAVID W. HOUSTON, III
UNITED STATES BANKRUPTCY JUDGE

36